IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:13-CV-211-FL

| | |
|---|---|
| CHARLENE HILL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-23 & DE-27] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff Charlene Hill ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of her applications for a period of disability, disability insurance benefits ("DIB") and supplemental security income ("SSI"). The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, the undersigned recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's Motion for Judgment on the Pleadings and remanding this matter to the Commissioner for further proceedings.

## STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on February 11, 2009, and filed an application for SSI on January 28, 2009, alleging disability beginning April 7, 2007. (R. 9.) On September 24, 2010, a video hearing was held before Administrative

Law Judge Edward W. Seery ("ALJ Seery"), who issued an unfavorable ruling on October 28, 2010. (R. 9, 90-103.) Claimant's request for review by the Appeals Council was denied on April 14, 2011, and, after considering additional information provided by Claimant, again on July 13, 2011, making ALJ Seery's decision the final decision of the Commissioner. (R. 9.)

Claimant then protectively filed a second application for a period of disability and DIB, as well as second application for SSI, on November 16, 2010, alleging disability beginning April 7, 2007. (R. 9, 346-359.) The applications were denied initially and upon reconsideration, and a request for hearing was filed. (R. 9, 114-138, 144-156, 158-170.) On November 16, 2011, a hearing was held before Administrative Law Judge McArthur Allen ("ALJ Allen"), who issued a ruling on January 25, 2012, finding that Claimant was not disabled. (R. 180.)

On November 15, 2012, the Appeals Council granted Claimant's request for review, vacated ALJ Allen's January 25, 2012, decision and remanded the case to ALJ Allen for further evaluation of the opinions of nontreating sources and consideration of the findings set forth in ALJ's Seery's October 28, 2010, decision concerning Claimant's mental impairments. (*See* R. 9-10, 196-97.) Upon remand from the Appeals Council, a new video hearing was held before ALJ Allen on March 22, 2013, at which Claimant was represented by counsel, appeared and testified and a vocational expert, Celena Earle ("VE"), appeared and testified. (R. 10, 67-89.) ALJ Allen issued a ruling on April 8, 2013, finding that ALJ Seery's prior decision dated October 28, 2010, was final and binding and that the unadjudicated period at issue was October 29, 2010, through April 8, 2013, the date of ALJ Allen's decision.[1] (R. 9-23, 90-112.) On July

---

[1] With respect to Claimant's claim for a period of disability and DIB, ALJ Allen noted that, pursuant to the insured status requirements of sections 216(i) and 223 of the Act, Claimant had only acquired sufficient quarters of coverage to remain insured through September 30, 2012. (R. 10.) Thus, Claimant was required to establish disability on or before that date in order to be entitled to a period of disability and DIB. (*Id.*)

26, 2013, the Appeals Council denied Claimant's request for review, making ALJ Allen's April 8, 2013, decision the final decision of the Commissioner. (R. 1-3.) Plaintiff now seeks judicial review of the final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision denying disability benefits under the Social Security Act, 42 U.S.C. §§ 301 *et seq.*, ("Act") is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; [i]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)) (internal quotation marks and citation omitted) (alteration in original). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589) (internal quotation marks omitted) (first and second alterations in original). Rather, in conducting the "substantial evidence" inquiry, the court determines whether the Commissioner has considered all relevant evidence and sufficiently explained the weight accorded to the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

## DISABILITY EVALUATION PROCESS

In making a disability determination, the Commissioner utilizes a five-step evaluation process as set forth in 20 C.F.R. §§ 404.1520 and 416.920. The Commissioner asks,

3

sequentially, whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1; (4) can perform the requirements of past work; and, if not, (5) based on the claimant's age, work experience and residual functional capacity can adjust to other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520, 416.920; *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy that the claimant can perform. *Id.*

When assessing the severity of mental impairments, the administrative law judge ("ALJ") must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the special technique. *Id.* §§ 404.1520a(e)(3), 416.920a(e)(3).

Applying the above-described sequential evaluation process, ALJ Allen found Claimant "not disabled" as defined in the Act. At step one, he found that Claimant was no longer engaged in substantial gainful employment. (R. 12.) Next, ALJ Allen determined that Claimant had the following severe impairments: hypothyroidism, obesity, affective disorder, depression, post-traumatic stress disorder ("PTSD"), and a history of alcohol dependence. (R. 12-13.) ALJ Allen

also found that Claimant had the following non-severe impairments: gastroesophageal reflux disease ("GERD"), hypertension, menopause, attention deficit disorder ("ADD"), blurred vision, headaches, high cholesterol, and musculoskeletal pain in lower back, joints, neck, hands, and knees. (R. 13.) However, at step three, ALJ Allen concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13-16.) Applying the technique prescribed by the regulations, ALJ Allen found that Claimant's mental impairments have resulted in mild limitations in her activities of daily living, moderate difficulties in social functioning and concentration, persistence and pace, and no episodes of decompensation of extended duration. (R. 14-15.)

Prior to proceeding to step four, ALJ Allen assessed Claimant's residual functional capacity ("RFC"), finding Claimant had the ability to perform light work with the following additional limitations:

> The claimant is limited to only occasional bending, balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs. She can never climb ladders, ropes, or scaffolds and must avoid exposure to hazardous machinery. The claimant is limited to work involving only simple, routine, repetitive tasks. She requires a low stress, low production work environment, which is defined as involving no complex decision-making, constant change, or exposure to crisis situations. Finally, the claimant should generally work by herself, not as part of a team, and should report to only one supervisor at a time.

(R. 16.) In making this assessment, ALJ Allen found Claimant's statements about her limitations not fully credible. (R. 17-21.) At step four, he concluded that Claimant has the RFC to perform the requirements of past relevant work as a housekeeper. (R. 21-23.) Alternatively, he made step-five findings, determining that Claimant, based upon her age, education, work experience and RFC, is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the local and national economies. (R. 23.)

5

**DISCUSSION**

I.  **Claimant's Cervical Degenerative Disc Disease**

Claimant first contends that ALJ Allen committed reversible error at step two of the sequential evaluation process by failing to classify Claimant's cervical DDD as a "severe" impairment. (Pl.'s Mem. at 11-17.) A "severe" impairment within the meaning of the regulations is one that "significantly limits . . . [a claimant's] physical or mental ability to do basic work activities."[2] 20 C.F.R. §§ 404.1520(c), 416.920(c). Conversely, an impairment is not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." SSR 85-28, 1985 WL 56856, at *3 (Nov. 15, 1985); *see also Evans v. Heckler,* 734 F.2d 1012, 1014 (4th Cir.1984). The claimant has the burden of demonstrating the severity of her impairments. *Pass*, 65 F.3d at 1203.

After fully considering the evidence, ALJ Allen found that Claimant's cervical DDD did not impose more than a minimal effect on her ability to perform basic work functions. (R. 13.) Claimant challenges ALJ Allen's finding, arguing that the objective medical evidence demonstrates that her cervical DDD is a severe impairment. (Pl.'s Mem. at 11-17.) In particular, Claimant points to x-rays of her cervical spine on November 23, 2010, which showed diffuse degenerative changes consisting of bulky anterior osteophyte formations at C4 through C7 and moderate left-sided foraminal narrowing at C5 through C7 due to uncovertebral spurring. (R. 13,

---

[2] Basic work activities are defined as the "abilities and aptitudes necessary to do most jobs." *Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986) (citing 20 C.F.R. § 416.921(b)). For example, work activities might include walking, standing, sitting, lifting, pushing, pulling, and reaching; the capacity to see, hear and speak; and understanding, carrying out, and remembering simple instructions. *Id.*

484.) When considering these findings from the November 23, 2010, cervical x-rays, ALJ Allen explained that during a hospital visit just five days prior to the x-rays "[C]laimant's back was noted as non-tender and with painless range of motion." (R. 13, 493.)

Objective medical evidence of an impairment, in this case "osteophyte formations" and "foraminal narrowing," does not require a finding that the impairment is "severe"; there must be a showing of significant, related functional loss for the period adjudicated. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing *Sitar v. Schweiker*, 671 F.2d 19, 20-21 (1st Cir. 1982)); *see also Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) (finding that the ALJ properly focused not on the claimant's diagnosis, but on the extent of the claimant's actual functional limitations). A physician's mere diagnosis of a condition says nothing about the severity of the claimant's condition or the resultant limitations, if any. *See Thompson v. Astrue*, 442 F. App'x 804, 808 (4th Cir. 2011). In this case, ALJ Allen refrained from making an unsupported inference as to the severity or resultant limitations of Claimant's condition based solely on her diagnosis and instead focused on the fact that Claimant had full range of motion in her back without pain or tenderness just five days earlier. (R. 13.) In addition, when ALJ Allen asked Claimant whether she was terminated from her last job because she was physically or mentally unable to meet production quotas, Claimant testified that "it wasn't physical." (R. 36-38, 405.)

As further support for his conclusion, ALJ Allen cited the "evidence indicat[ing] that the claimant has been able to walk for exercise and do some yard work, despite her complaints of back pain." (R. 415, 538). While there is conflicting evidence as to whether Claimant actually exercised or did yard work during the relevant period (R. 415, 538), the court should not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its]

7

judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig*, 76 F.3d at 589) (internal quotation marks omitted) (first alteration in original). Furthermore, Claimant's uncontroverted testimony is that walking does not exacerbate her back pain (R. 46), she is able to keep her bathrooms clean (R. 51), cook for herself (R. 52), wash the dishes (R. 412), drive herself to the grocery store and shop (R. 52-53), do laundry (R. 73), and perform other light household duties (R. 74).

Next, Claimant contends that her statements and those of her boyfriend, Hugh Gillikin, support a finding that her cervical DDD is a severe impairment. (Pl.'s Mem. at 12.) Claimant points to her first hearing before ALJ Allen when Claimant testified that her neck is "painful pretty much all the time." (R. 44.) However, when asked by ALJ Allen why she could no longer work, Claimant focused on her mental problems and did not mention her neck pain until he specifically asked about her neck. (R. 35-36, 41-44.) Claimant went on to say that, despite her neck pain, she can lift her head all the way up and down and left and right. (R. 44.) Further, when asked to "[l]ist all of the physical or mental conditions that limit your ability to work" on her "Disability Report – Adult – Form SSA-3368," Claimant listed a number of conditions, including "*lower* back pain," but failed to include any neck, upper back, or cervical conditions. (R. 403 (emphasis added).) Furthermore, Claimant had a normal physical examination of her neck on November 18, 2013, where it was noted as non-tender and with painless range of motion. (R. 492.)

Mr. Gillikin's statement that Claimant told him she does not do much housework because of pain is not supported by the evidence of record. (R. 412.) Rather, the record indicates that she is capable of doing many household chores. (*See* R. 51-53, 73-74, 412, 538.) Additionally, Claimant testified that prolonged walking, standing, or sitting does not exacerbate her pain. (R.

8

46.) As noted by ALJ Allen, it is also significant that Claimant has a history of "minimal and conservative treatment, such as the use of Voltaren gel on a prn basis, for her back complaints." (R. 46-47, 477-78.) Indeed, Claimant's pain medication has been limited to a non-narcotic pain relieving gel, similar to Icy Hot®. (R. 46-47.) Despite Claimant's alleged limitations, the objective medical evidence of record does not demonstrate that Claimant's cervical DDD significantly limits her ability to perform basic work activities. Accordingly, substantial evidence supports the ALJ's conclusion that Claimant's cervical DDD is not a severe impairment.

Claimant acknowledges that an ALJ's failure to characterize an impairment as severe at step two of the sequential evaluation process is not reversible error provided the ALJ considers that impairment in subsequent steps. Nevertheless, Claimant argues that ALJ Allen committed reversible error because he did not mention Claimant's cervical DDD at subsequent steps and included no further analysis of Claimant's related complaints of pain. (Pl.'s Mem. at 12-13.) At step two of the sequential evaluation process, an ALJ must determine whether a claimant's impairment(s), individually or in combination, are "severe." 20 C.F.R. §§ 404.1523, 416.923. So long as a claimant has any severe impairment or combination of impairments, the ALJ must proceed beyond step two and consider all of the impairments (including non-severe impairments) at the remaining steps of the sequential evaluation process. *Id.*; *see also* SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (explaining that the existence of one or more severe impairments requires the ALJ to "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'").

Thus, courts have found that an ALJ's failure to find a particular impairment severe at step two does not constitute reversible error where the ALJ determines that a claimant has other

9

severe impairments and proceeds to evaluate all the impairments at the succeeding steps in the evaluation.  *See Jones v. Astrue*, No. 5:07-CV-452-FL, 2009 WL 455414, at *2 (E.D.N.C. Feb. 23, 2009) (noting that, although the Fourth Circuit has not addressed the question, it agrees with the conclusions of these other courts); *Hill v. Astrue,* 289 Fed. Appx. 289, 292 (10th Cir.2008); *Pittman v. Astrue*, No. 5:08-CV-83-FL, 2008 WL 4594574, *4 (E.D.N.C. Oct. 10, 2008) (finding that ALJ's failure to set forth specific facts at step two regarding severity of claimant's knee impairment was not reversible error because ALJ considered all of claimant's impairments in formulating RFC); *see also Maziarz v. Sec'y of Health & Human Servs,* 837 F.2d 240, 244 (6th Cir.1987).  In *Maziarz*, the Sixth Circuit stated:

> Maziarz argues that the Secretary erred in failing to find that his cervical condition constitutes a severe impairment. We find it unnecessary to decide this question. According to the regulations, upon determining that a claimant has one severe impairment, the Secretary must continue with the remaining steps in his disability evaluation as outlined above. In the instant case, the Secretary found that Maziarz suffered from the severe impairment of coronary artery disease, status post right coronary artery angioplasty and angina pectoris. Accordingly, the Secretary continued with the remaining steps in his disability determination. Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error.

*Id.*; *see also Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) ("easily dispos[ing]" of claimant's argument that remand was appropriate where the ALJ failed to determine that some of her impairments were "severe" because the ALJ had determined that others were "severe").

In this case, ALJ Allen found in Claimant's favor at step two and proceeded to the remaining steps of the sequential evaluation process. (R. 12-23.)  Moreover, he thoroughly discussed the evidence relating to all of Claimant's impairments, including the x-rays of Claimant's cervical spine (R. 13), and took Claimant's "combined impairments" into account in

determining her RFC. (R. 21). Furthermore, ALJ Allen explicitly stated at step two that, even if severe, Claimant's musculoskeletal complaints – including cervical pain – "would be adequately accommodated by the RFC restriction to light exertional work." (R. 13.) Accordingly, even if Claimant's cervical DDD should have been classified as a severe impairment at step two, ALJ Allen's failure to do so is not reversible error.

## II.     Medical Opinions

Next, Claimant argues that ALJ Allen improperly assessed the medical opinions in this case by assigning little weight to the expert medical opinions of her treating psychiatrist, Dr. Drew C. Hunsinger, and giving significant weight to the medical opinions of nonexamining consultants Dr. Banu Krishnamurthy and Dr. Brett A. Fox. (Pl.'s Mem. at 13-17.)

Regardless of the source, an ALJ must evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Though the opinion of a treating physician on the nature and severity of a claimant's impairment is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig,* 76 F.3d at 590. A treating physician's opinion on the nature and severity of a claimant's impairment is given controlling weight only if it is "supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on the record." *Mastro*, 270 F.3d at 178; *see also* 20 C.F.R. § 404.1527(c)(2) (2013). "[B]y negative implication, if a physician's opinion is

11

not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (quoting *Craig*, 76 F.3d at 590) (internal quotation marks omitted). Thus, the ALJ has the discretion to give less weight to the treating physician's testimony in the face of contrary evidence. *Id.* However, "remand is appropriate where an ALJ fails to discuss relevant evidence that weighs against his decision." *Id.* at 290 (citing *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987)).

If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must then determine the weight to be given to the treating physician's opinion by applying the following factors: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidentiary support for the physician's opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the physician is a specialist in the field in which the opinion is rendered. 20 C.F.R. 404.1527(c)(2)–(5); *see also Parker v. Astrue*, 792 F. Supp. 2d 886, 894 (E.D.N.C. 2011).

ALJ Allen assigned "little weight" to the medical opinion of Claimant's treating psychiatrist, Dr. Hunsinger. (R. 20.) In his decision, ALJ Allen discusses two medical source statements by Dr. Hunsinger. (R. 19-20, 560-61, 592-93.) In the first, dated November 1, 2011, Dr. Hunsinger stated that he had treated Claimant for about four years and she "has major depressive disorder, recurrent, severe; panic disorder with agoraphobia; PTSD; and social phobia." (R. 560.) He noted that her symptoms include "anhedonia, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating and thinking, motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning." (*Id.*) He further noted Claimant's history of "severe problems with depression and anxiety" and stated that her mental diseases have not been "well-

12

controlled" by her medications, making it almost impossible for her to interact with people. (*Id.*) Next, Dr. Hunsinger noted global assessment of functioning ("GAF") scores ranging from 35 to 50 from October 12, 2010, to June 21, 2011, indicating serious or very serious impairments in several areas of functioning.³ (*Id.*) Finally, Dr. Hunsinger opined that Claimant "cannot work on a regular and continuing basis, five days a week, eight hours a day. Her condition and associated symptoms, and medical treatment for them, necessitate her being unable to work for more than three days per month." (*Id.*)

The second medical source statement from Dr. Hunsinger, dated June 5, 2012, is captioned as a "Medical Statement Concerning Schizoaffective Disorder." (R. 592-93.) In the first section of this report, under disease symptoms, Dr. Hunsinger indicated that Claimant suffers from some or all of the following, either intermittently or persistently: "anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, or hallucinations, delusions or paranoid thinking." Additionally, Dr. Hunsinger opined that Claimant suffers from emotional withdrawal or isolation on a persistent basis and assessed Claimant with moderate restriction in activities of daily living and extreme difficulty in maintaining social functioning.

---

³ The GAF scale is used by mental health professionals to rate an individual's level of social, occupational, and psychological functioning, which is reported at Axis V of the multiaxial diagnostic assessment as set forth in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV). The GAF score represents a practitioner's subjective assessment of the patient's psychological, social and occupational functional capacities along a hypothetical continuum ranging from 1-100, with 100 being the highest level of functioning. The Social Security Administration has not endorsed the GAF scale for use in Social Security and SSI disability claims, as it is the agency's position that GAF scores do not have a direct correlation to the severity requirements for Social Security mental disorder listings. *See* 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000). However, a GAF score may still be of assistance to an administrative law judge in formulating a claimant's residual functional capacity.

(R. 592.) Next, he noted that Claimant has "[d]eficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere)" as well as "[r]epeated [e]pisodes of deterioration or decompensation in work or work-like settings which cause [her] to withdraw from the situation or experience exacerbation of signs and symptoms (which may include deterioration of adaptive functioning)." (*Id.*) He also rated Claimant as having either marked or extreme levels of impairment in multiple work functions, including the ability to remember locations and work-like procedures; understanding, remembering, and carrying out both simple and detailed instructions; maintaining attention and concentration for extended periods; performing on a schedule; sustaining a routine without supervision; working in coordination and proximity to others; accepting instruction and criticism from supervisors; and interacting appropriately with the public. (R. 593.) Finally, Dr. Hunsinger noted that a diagnosis of intermittent explosive disorder had been added due to Claimant's repeated outbursts and concluded that Claimant is "disabled." (*Id.*)

Throughout his records, Dr. Hunsinger notes that Claimant is suffering from poor memory and concentration, crying spells, depressed mood, anxiety, feelings of worthlessness, low energy and desire, and emotional difficulties. (R. 472, 511, 512, 514, 531, 537, 564, 568, 571, 572, 592.) He also notes repeatedly that Claimant is unstable. (R. 514, 515, 531, 564.) In July 2012, Dr. Hunsinger discharged Claimant from his care due to her abusive and threatening language toward a receptionist and a nurse.

In support of his assignment of "little weight" to the medical opinions of Dr. Hunsinger, ALJ Allen explained:

> [C]laimant's low GAF scores . . . are highly subjective and . . . several of the scores here do not appear to comport with the objective evidence. For example, Dr. Hunsinger reports a score of 35, which would ordinarily denote impairment in reality testing, or major impairment in several areas of functioning. However this

14

> low score appears to have been triggered by the situational stressor of a fight with her boyfriend . . . . Despite these low scores, there is no evidence that the claimant has not been able to live independently, care for her basic needs, and maintain[] some level of social contacts. Finally, despite the significant limitations imposed in Dr. Hunsinger's opinions, the undersigned notes that he does not address the multiple references in his treatment notes to the claimant's fixation on receiving disability benefits and the effect that this has on her mental condition.

(R. 20.) Claimant contends that these findings are not supported by substantial evidence. (Pl.'s Mem. at 13-17.) The undersigned agrees.

Admittedly, GAF scores can be highly subjective, particularly when based primarily on a patient's self-assessment or when the professional giving the score bases it on another professional's records. In this case, however, Dr. Hunsinger based his scores upon his clinical observations of Claimant. Additionally, Dr. Hunsinger provided a GAF score at the bottom of his notes for each individual visit, and the scores are consistent with his treatment notes and his opinions. (*See* R. 472, 475, 511-12, 520, 531, 533-37, 562, 564-69, 571-72, 592.) ALJ Allen points to Dr. Hunsinger's assignment of a GAF score of 35 to Claimant on July 19, 2011, as evidence that "several of the [GAF] scores" do not appear to "comport with objective evidence." (R. 20, 534.) ALJ Allen is correct that a GAF score of 35 is suggestive of major impairment in several areas, such as family relations, judgment, thinking, or mood. *See* Axis V of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV). However, according to Dr. Hunsinger's treatment notes on July 19, 2011 (R. 534), Claimant had impairment in several of these areas, specifically family relations, judgment, and mood. Therefore, while it may be true that Claimant's GAF score of 35 on July 19, 2011, was influenced by a fight with her boyfriend, her overreaction and volatility to such stressful situations, as well as her depression, supports the low GAF score. (R. 534.) Indeed, Claimant kicked her boyfriend out of the house and though they later reconciled, Claimant testified subsequently that she has persistent thoughts of hurting

15

him. (R. 80.) Thus, despite ALJ Allen's criticism of the GAF score from July 19, 2011, it is supported by the evidence of record. (R. 20.)

Furthermore, ALJ Allen does not indicate which of the other GAF scores he believes do not comport with the objective evidence of record. (R. 20.) Rather, he discounts all of the GAF scores and Dr. Hunsinger's opinions because "there is no evidence that claimant has not been able to live independently [or] care for her basic needs." (R. 20.) However, Dr. Hunsinger does not suggest that Claimant is unable to live "independently." In fact, Dr. Hunsinger specifically notes that Claimant is only "moderately limited" in her activities of daily living and does not suffer from a complete inability to function outside of her home. (R. 592.) Thus, the ALJ's rejection of Dr. Hunsinger's opinion on this ground must fail.

ALJ Allen also discredits Dr. Hunsinger's opinion on the ground that Claimant has been able to "maintain[ ] some level of social contacts." (R. 20.) However, the only significant social contact Claimant has had with anyone has been her boyfriend. (R. 78.) Although she has been able to maintain this relationship for a period of years, they live separately and the relationship has been marked with significant breakups and fighting, as well as Claimant's persistent thoughts of hurting him. (*See* R. 49, 79-80, 534.) The evidence of record demonstrates that Claimant has had problems interacting not only with her boyfriend (R. 79-80), but also her mother (R. 80-81), co-workers (R. 39-40, 81-82), and Dr. Hunsinger's staff (R. 563). Dr. Hunsinger's statement that Claimant is extremely limited in social functioning is, therefore, supported by the record.

Finally, ALJ Allen suggests that Dr. Hunsinger's opinion is flawed because no significance is given to Claimant's "fixation on receiving disability benefits" documented in Dr. Hunsinger's medical records and "the effect that this has on her mental condition." (R. 20.) However, a claimant's expressed desire to obtain disability benefits does not necessarily impact

16

her mental condition or suggest that she is malingering. While the record in this case is clear that Claimant wants a source of income to help her with her financial problems and that Claimant would like the freedom to decide whether to end the tumultuous relationship with her boyfriend (R. 534, 562-63, 566, 569-70), it does not necessarily follow that Claimant is malingering or that she is anything other than distraught over her inability to secure financial assistance to which she believes she is entitled. Claimant's treating psychiatrist, Dr. Hunsinger, who examined her more than any other healthcare physician, certainly did not think Claimant was malingering. (R. 563, 570.) Indeed, his medical records make clear that he offered to assist Claimant with her disability appeal because he believes she is disabled. (R. 560-63, 570, 592-93.)

ALJ Allen's assignment of "little weight" to the medical opinion of Dr. Hunsinger is not supported by substantial evidence. The evidence in this case establishes that Dr. Hunsinger is a specialist in the field of psychiatry and had a four-year treatment relationship with Claimant during which he examined her frequently and thoroughly. There is ample evidence in the record to support Dr. Hunsinger's opinions, and ALJ Allen's decision finding otherwise is not supported by the record. While ALJ Allen relied on the state consultants in denying Claimant's disability application, opinions of non-examining consultants are relevant only if supported by the medical record. "[R]eliance on the opinion of nonexamining physicians cannot, by itself, constitute substantial evidence." *Radford v. Colvin*, 734 F.3d 268 (4th Cir. 2013). Accordingly, it is recommended that this matter be remanded to the Commissioner for further consideration of Dr. Hunsinger's opinions.

17

Case 4:13-cv-00211-FL   Document 29   Filed 12/29/14   Page 17 of 18

### III.     Claimant's Credibility

Finally, Claimant asserts that the ALJ erred in assessing her credibility. (Pl.'s Mem. at 8-10.) Given the undersigned's recommendation that the case be remanded for further consideration of Dr. Hunsinger's medical opinion, there exists a substantial possibility that the Commissioner's credibility finding may be different on remand. Accordingly, the undersigned expresses no opinion whether the Commissioner erred in assessing Claimant's credibility.

### CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-23] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-27] be DENIED, and the matter be remanded to the Commissioner for further consideration.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have fourteen (14) days from the date of service to file written objections. Failure to file timely, written objections shall bar an aggrieved party from obtaining de novo review by the District Judge on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Judge.

This 29th day of December 2014.

*(signature)*
KIMBERLY A. SWANK
United States Magistrate Judge